UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
x- - - - - - - - - - - - - - - x
IN THE MATTER OF:              . Case No. 16-27041(JKS)
                               . Newark, New Jersey
HANJIN SHIPPING CO., LTD.,     . Chapter 15
                               .
     Foreign Representative.   . September 15, 2016
- - - - - - - - - - - - - - - -. 11:15:00 a.m.
```

TRANSCRIPT OF MOTION RE:
MOTION FOR RECONSIDERATION
BY THE MARITIME LEINHOLDERS
**BEFORE THE HONORABLE JOHN K. SHERWOOD**
**UNITED STATES BANKRUPTCY JUDGE**

```
APPEARANCES:
For the Foreign          Cole Schotz PROBABLE CAUSE
Representative:          By:  ILANA VOLKOV, ESQ.
                              EDWARD KIEL, ESQ.
                         25 Main Street
                         Hackensack, New Jersey 07601


For Maher Terminals,     Lowenstein Sandler, LLP
LLC, et al:              By:  PHILIP GROSS, ESQ.
                         65 Livingston Avenue
                         Roseland, New Jersey 07068


For Textainer Equipment  Simms Showers LLP
Management, et al.:      By:  J. STEPHEN SIMMS, ESQ.
                         201 International Circle
                         Baltimore, Maryland 21030


For Wells Fargo, as      Porzio, Bromberg & Newman PC
administrative agent     By:  JOHN MAIRO, ESQ.
to senior lenders of          AARON JAVIAN, ESQ.
Total Terminals          100 Southgate Parkway
International             Morristown, New Jersey 07962


Electronic Court Reporter:            Edith Valentin
Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
```

---

**TRACY GRIBBEN TRANSCRIPTION, LLC**
859 Nutswamp Road
Red Bank, New Jersey 07701
**800 603-6212**
**(732) 263-0044    Fax No. 732-865-7179**
www.tgribbentranscription.com

2

```
APPEARANCES CONTINUED:

For Forever 21;          Pillsbury Winthrop Shaw Pittman
Toyo Tire               By: SAMUEL S. CAVIOR, ESQ.
                        1540 Broadway
                        NY, NY 10036


For Total Terminals      Fox Rothschild
International, LLC:       By:  RICHARD M. METH, ESQ.
                             DOUGLAS DEUTSCH, ESQ
                        75 Eisenhower Parkway, Suite 200
                        Roseland, New Jersey
                        Clifford Chance


                        By:  DOUGLAS E. DEUTSCHE, ESQ.
                        31 West 52nd Street
                        New York, New York 10019


For Canadian National    Norton Rose Fulbright US LLP
Railway Company:         By:  DAVID A. ROSENZWEIG, ESQ.
                        1301 Avenue of the Americas
                        New York, New York 10019-6022


For Emerson Climate       Scarinci & Hollenbeck, LLC
Technologies, Inc.,       By:  JOEL GLUCKSMAN, ESQ.
et al.:                  1100 Valley Brook Avenue
                        Lyndhurst, New Jersey 07071


For BNSF Railway:         Haymes & Boone
                        By:  TREVOR HOFFMANN, ESQ.
                        30 Rockefeller Plaza
                        New York,  NY  10112


For Yamaha & Amerigo      Greenberg Traurig, LLP
Group:                   By: MARK D. BLOOM, ESQ.
                             ALAN BRODY, ESQ.,
                             PAUL KEENAN, ESQ.,
                        500 Campus Drive
                        Florham Park, New Jersey


For                     Bederson, LLP
                        By: TIMOTHY KING, ESQ.,
                        347 Mount Pleasant Ave
                        West Orange, NJ  07052


For Textainer, et al:     Wasserman Jurista & Stolz
                        By: DONALD CLARKE, ESQ.
                        110 Allen Road, #304
                        Basking Ridge,  NJ  07920
```

3

APPEARANCES CONTINUED:

```
                              McDermott Will & Emery
                              By: DARREN AZMAN, ESQ
                                  ANDREW KRATENSTEIN, ESQ
                              340 Madison Avenue
                              NY, NY  10173

Creditor                      Benesch Friedlander Coplan & Aronoff
                              By: KEVIN M. CAPUZZI, ESQ.
                              411 Hackensack Ave.
                              Hackensack, NJ 07601

For Creation Tech:            Chiesa Shahinian & Giantomasi
                              By:  SCOTT A. ZUBER, ESQ.
                              One Boland Drive
                              West Orange, NJ 07052

For Carrix Entities:          Wilkie Farr & Gallagher
                              By:  JOHN LONGMIRE, ESQ.
                              CHRISTOPHER KOENIG, ESQ.
                              787 Seventh Avenue
                              New York, NY 10019


Union Pacific RR              McCarter & English
Hayward Industries            By:  JEFFREY TESTA, ESQ.
                                   DEIRDRE E. BURKE, ESQ
                              100 Mulberry Street
                              Newark, NJ 07102

For                           RICHARD VOHROVC, ESQ
                              719 Van Houten AVenue
                              Clifton, NJ

For Ocean Connect/            Gregory & Reed
World Fuel                    By: STEVEN REED, ESQ
                              2 Sylvan Way
                              Parsippany, NJ 07054

For NYK Ports, et al:         Price Meese Shulman D'Arminio
                              By:  RICK A. STEINBERG, ESQ.
                              50 Tice Boulevard
                              Woodcliff Lake, NJ 07677
```

```
TELEPHONIC APPEARANCES:
                            GERALD GORMAN, ESQ.
                            BRIAN MOONEY, ESQ.

For HSN                     AKERMAN, LLP
                            BY:  SUSAN BALASCHAK, ESQ.
                            666 Fifth Avenue
                            New York, NY 10103


                            MATTHEW BROOKS, ESQ.
                            TIM CORRIGAN, ESQ.
                            ANDREW DEVORE, ESQ.
                            ANDREW DOVE, ESQ.

For HP, Inc.:               Pachulski Stang Ziehl & Jones, LLP
                            By:  ROBERT FEINSTEIN, ESQ.
                            730 Third Avenue, 34th Floor
                            New York, New York 10017

For Samsung Electronics     O'Melveny & Myers, LLP
Co. Ltd:                    By:  EVAN JONES, ESQ.
                            400 South Hope Street, 18th Floor
                            Los Angeles, California 90071

For Union Pacific:          Sidley Austin, LLP
                            By:  DENNIS KAO, ESQ.
                            787 Seventh Avenue
                            New York, New York 10019

For Yamaha & Amerigo        Greenberg Traurig, LLP
Group:                      By:  PAUL J. KEENAN, ESQ.
                            500 Campus Drive
                            Florham Park, New Jersey

For Ashley Furniture:       Potter Anderson & Carroon, LLP
                            By:  JEREMY W. RYAN, ESQ.
                            1213 North Market Street
                            Wilmington, Delaware 19801

For Samsung Electronics     O'Melveny & Myers, LLP
Co. Ltd:                    By:  DANIEL S. SHAMAH, ESQ.
                            7 Times Square
                            New York, NY 10036

For Eastman Chemical        McGuireWoods
Company:                    By:  JAMES E. VAN HORN, ESQ.
                            7 Saint Paul Street, Suite 1000
                            Baltimore, Maryland 21202-1671
```

1                              I N D E X

2                              (9/15/16)

3                                                         PAGE

4       ARGUMENT BY:

5       MR. SIMMS                                         10

6       MR. REED                                          16

7       MS. VOLKOV                                        29

8       DECISION                                          32

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Prior portions of proceeding not requested)

2              THE COURT: All right, let's turn to the motion for

3      reconsideration by the Maritime lienholders.

4              MR. SIMMS: Some developments since last week and I --

5              THE COURT: State your name for the record.  Steve

6      Simms for the Martitime lien creditors and for Textainer which

7      is also a maritime lien creditor.

8              So I think the Court's observation that the case

9      needs to breath is a good one and we've had some breathing in

10     the last week.  The claims for Ocean Connect against the

11     Montevideo, principal amounts were paid.  The claims against

12     the Hanjin Greece principal amounts were paid.

13             There's some amounts still due on that arrest also to

14     World Fuel.  Mr. Reed there is going to have something to say

15     too.  But we're moving ahead.

16             THE COURT: Well hold on, hold on.  Is this a motion

17     for reconsideration of my order or is this a status report?

18             MR. SIMMS: This is, as we left it last week, we

19     wanted reconsideration because of the non-payment of, on the

20     Greece.  The Greece is paid.  Now --

21             THE COURT: Where was the Greece?

22             MR. SIMMS: In Long Beach.  The Greece was the first

23     --

24             THE COURT: Okay, was that arrested?

25             MR. SIMMS: No, sir.

1              THE COURT: It was just sitting in Long Beach?

2              MR. SIMMS: Yes, sir.

3              THE COURT: Okay.

4              MR. SIMMS: We have, we have the --

5              THE COURT: So that's good.

6              MR. SIMMS: We have the, on the Greece, the sufficient

7    protection.  And we have on the Montevideo almost the

8    sufficient protection.

9              So in the last week and immediately when Your Honor

10   made Your Honor's order, we filed a reconsideration of motion

11   and along with that set out the Korean law.

12             And it's clear, there's no security at all.  There is

13   no sufficient protection for these maritime lien creditors,

14   none.  And there is, the speculation of Korean counsel on the

15   phone that there is does not hold up.  Fundamentally in Korea

16   there is no maritime claim against a ship where the claim is

17   originated by a charterer.  Hanjin is a charterer.

18             Our maritime lien claims have no rights at all in

19   Korea.  For that reason and also because the ships are not

20   Hanjin estate property.  Not even the Hanjin Scarlet is Hanjin

21   estate property, it's own by the Hanjin Trust which is not in

22   insolvency proceedings.

23             THE COURT: Is it chartered by Hanjin?

24             MR. SIMMS: It is chartered by Hanjin.

25             THE COURT: Okay.

1          MR. SIMMS: But the point is this, all right, if these

2     were owned vessels by Hanjin, we still wouldn't have any

3     secured claim in Korea.  We have no claim.  And so --

4          THE COURT: Well you have no claim outside of the west

5     either.  And most of these vessels are outside of the U.S.

6          MR. SIMMS: And we're only talking about a handful of

7     vessels.  And as --

8          THE COURT: Listen --

9          MR. SIMMS: Going back to the idea of breathing, in

10    the last week and since the case has begun, the maritime lien

11    creditors that the Court has heard from is our clients and

12    World Fuel and that's it.  And there's not a whole ocean of

13    maritime lien creditors who are coming in to claim against

14    these ships.  The --

15         THE COURT: Maybe they're just, think they're bound by

16    the stay that was entered in Korea.

17         MR. SIMMS: No, no, sir, I don't think they think

18    that.  Because they know that they will lose their rights.  If

19    they're well advised, they know they'll lose their rights if

20    the ships depart U.S. and are not arrested.

21         Well the Hansa Gdynia just pulled in last night to

22    Long Beach.  And I don't think there are any maritime lien

23    claimants that have claims against the Gdynia.  Mr. Reed does

24    World Fuel have?

25         MR. REED: I know we have claims against three ships

1   that are off the U.S., but I'm not sure if that's --

2           MR. SIMMS: Not the Gdynia, okay.  So I put in the

3   further support paper that we filed, the sum total of what the

4   maritime lien creditors are owed, all right at the top.  The

5   Baltimore is now under arrest down next to, on the Panama side,

6   the Pacific side of the Canal, Panama Canal.  World Fuel is on

7   that ship too.  But there's $227,000 of our client's claims on

8   that ship.

9           The Boston which is now unloading, 238,000 worth of

10  claims.  So we would need relief to either come to terms with

11  the Boston owners who are on the phone or to arrest that ship.

12  Because once it goes, it's gone.  Let me stop --

13          THE COURT: Where is the Boston now?

14          MR. SIMMS: It's a Long Beach.

15          THE COURT: All right, so the Boston comes into Long

16  Beach under the protection of my order that I entered on

17  Friday.  And now you want me to change my mind and say sorry

18  I'm going to allow the maritime lien holders --

19          MR. SIMMS: Well since --

20          THE COURT: To lien your vessel or seize you?  I'm not

21  going to do that.

22          MR. SIMMS: Since we have the Boston owners on the

23  phone, here's what's going to the Boston and they can tell me

24  if I'm wrong.

25          Number 1, it doesn't belong to Hanjin.  Number 2,

Simms/Argument                               10

1    there's no outbound cargo.   Number 3, the charter hire to the

2    Boston has been in arrears for at least two months and probably

3    more.   And number 4, if the Boston is still under charter which

4    I doubt, it's going to go off charter once it leaves.   It has

5    no employment.   It doesn't even have, you'll remember Your

6    Honor that --

7              THE COURT: Listen, if it goes off charter then it

8    won't be covered by the stay and you can get them when they're

9    in the U.S. next time.

10             MR. SIMMS: And why then, okay.   If it's still under

11   charter, why then should the Court not extend sufficient

12   protection to our creditors for that ship if all that's going

13   to happen is as soon as it gets three miles outside of the U.S.

14   it goes off charter and sails to Singapore or to some place

15   where we have no rights.   And then gets arrested by the foreign

16   mortgage holder that will prime us and wipe us out.   Why should

17   the Court permit that?   It's a --

18             THE COURT: I already permitted it.   I permitted it by

19   my order on Friday.

20             MR. SIMMS: The coming --

21             THE COURT: And they relied on my order and came to

22   Court.   I'm not going to, they had the right to rely on my

23   order.

24             MR. SIMMS: The, what -- they came in which is what

25   Your Honor wanted them to do.   But what Your Honor --

Simms/Argument                              11

1          THE COURT: And I, and they can leave.  They can leave

2     when they're done unloading.

3          MR. SIMMS: What Your Honor is doing --

4          THE COURT: You can enforce your claim, your Hanjin

5     claims against them in South Korea.  Or you can, once they come

6     off charter you can enforce those claims wherever.

7          MR. SIMMS: Your Honor let me just, we can't enforce

8     our claims in South Korea.  We can't.

9          THE COURT: You have zero claims?  You don't even have

10    an unsecured claim?

11         MR. SIMMS: We don't have to --

12         THE COURT: You don't have an administrative claim?

13         MR. SIMMS: That's not sufficient protection.  To

14    stand behind a billion dollars worth of secured debt is, with

15    the Court making us totally unsecured leaving our only, our

16    only right to payment which is security, that's, that can't

17    possibly be under 15:22 sufficient protection.  It can't

18    possibly.

19         And the Court having entered that order relating to

20    the Boston, it wasn't supported under 15:22 to begin with.

21    Because again the premise of the Court's order, the sea change

22    was when the Korean lawyers spoke up and said oh yes

23    absolutely, the maritime lien creditors will have protection in

24    Korea.

25         THE COURT: Paid in full they said.

1          MR. SIMMS: Not true.

2          THE COURT: Well they changed their mind later in the

3    hearing.

4          MR. SIMMS: Yes, they did.  Yes, they did.

5          THE COURT: They did soften that a lot.  And just to

6    be clear, when I made my decision I was, I did not believe that

7    if you guys filed in South Korea you would have a first lien

8    and be paid in full.  I knew, I know that your rights are a lot

9    better in ports here in the U.S. than they are anywhere else,

10   including Korea.  Well maybe not anywhere else, but in many

11   other places including South Korea.  I'm giving you, I gave

12   you, I understood that when I made the decision.

13         MR. SIMMS: Your Honor I know you did.  And so, but

14   the, many other places or hardly any places.  If what the Court

15   is saying is wait until the ships get to Panama or Canada, it's

16   basically the only two places we can exercise our maritime

17   liens and Australia.  They're not going there.  They're not

18   going they're.  They're here.

19         THE COURT: Yes, but maybe they weren't coming here

20   either if --

21         MR. SIMMS: Oh, let me go, let me go into that.  We

22   heard last week that Hanjin as a charterer directs where the

23   ships go.  The Court's order facilitated bringing the cargo in

24   and that was job one.

25         And so it's up to Hanjin to say bring the ships in.

1   Or it's up to the owners to say we are terminating the charter

2   and we're going to take the cargo someplace else.  What happens

3   when the cargo goes someplace else.  Owners have a problem.

4   For non-delivery of cargo, there are maritime liens.

5          And so the owners have to bring the ships in to where

6   the cargo is going to be delivered.  And this happens all the

7   times when there's an insolvent charter.  And when there's an

8   insolvent charter then the owners through their insurers often

9   will come and they will put security for the maritime liens.

10  It's standard, common, happens all the time.

11         This is and that's what can happen now.  And it's

12  Hanjin's call about whether the ships come in.  Hanjin's call.

13         Now what's going to happen to these ships.  Of course

14  it's a long way across the Pacific.  And they're going to have

15  to be repositioned, reprovisioned and repositioned.  And who's

16  going to pay for that.  Again, the ships are going to --

17         THE COURT: They might not get financing to get out.

18         MR. SIMMS: They're going to get turned back over if

19  they're not already turned back over, to the owners of the

20  ships.  And it will be the ship owners that need to put up the

21  security if Hanjin doesn't.  But --

22         THE COURT: Once Hanjin terminates the charter, then

23  you have the right to do that.

24         MR. SIMMS: Exactly.  And the ships will be outside of

25  the U.S. and outside of where we have security.  This is the

                              Simms/Argument                      14

1    place that we have security.

2                   And so the ship, so back to the chart here.  The

3    point of the chart is that there are a relatively few number of

4    ships now where maritime lien holders have come into the Court

5    and said Your Honor, give us the permission to arrest these

6    ships.

7                   And so what the Court can do is to say all right, I

8    know who's before me right now.  I have World Fuel, I have

9    these maritime lien holders.  I have claims against these

10   specific ships.  I am going to let them enforce their liens.

11   And anybody else who wants to come in, can make a claim to

12   arrest or to get security can do that.

13                  And so if there's, first after breathing for a week,

14   we see that there's not an ocean of maritime lien holders

15   coming in that are going to arrest the ship.  For ship holders

16   these are --

17                  THE COURT: So what is the universal plans now?

18   $850,000?

19                  MR. SIMMS: 850,000 for these claimants.

20                  THE COURT: Right.

21                  MR. SIMMS: Then Mr. Reed will tell you what the

22   universe is for World Fuel.  And then --

23                  THE COURT: What is the universe for World Fuel?

24                  MR. REED: Your Honor I have to get an accounting from

25   my client.  They said there were three ships that are off, that

1   are coming in.  And some may be birthed already.  I'd have to

2   get an accounting as to how much in fuel is owed.

3          THE COURT: All right.  Listen, the debtor doesn't

4   have enough financing as we sit here today to do, they've got

5   four ships.  They might have another four ships a week for now.

6          So what happens.  Do we just sit around and wait

7   until --

8          MR. SIMMS: No, sir, we don't.

9          THE COURT: They might never have financing.  They can

10  barely afford to unload, to birth, unload and transport their

11  cargo.  How are they going to get another, millions more

12  dollars to bond off these pre-petition liens?

13         MR. SIMMS: Understood.  And here is the situation for

14  the ship owners.  It's a standard situation that happens

15  whenever there are charters with in personam obligations that

16  become insolvent.

17         THE COURT: They're in personam obligations but

18  they're an account of a charter with the debtor.

19         MR. SIMMS: Yes.  But the vessel itself is considered

20  to be a separate person.  The vessel, the obligation is joint

21  and several.  The vessel is obligated to pay if Hanjin doesn't

22  pay.

23         And so the owners are the ones that need to put up

24  the security.  And it's only fair, all right.  How did the

25  ships get here in the first place, because of our fuel.

1    Because of our tugs.  Who got the cargo delivered.  If it

2    wasn't for the tugs, there'd be no cargo coming in.  If it

3    wasn't for the fuel, the ships would be just floating around

4    out in the ocean.

5         The Seaspan Efficiency is floating out in the middle

6    of the ocean.  We've talked to their counsel.  They were here

7    last Friday.  It's running on our fuel.  It took it on on

8    August 28th.  It's able to run and to preserve the owners'

9    value of the ship and the mortgage holders and everybody else

10   because of our fuel.  That's why you have maritime liens in

11   rem.  Because the maritime liens, the necessary benefit the

12   ship, make it run.  And so --

13        THE COURT: But you don't have those rights anywhere

14   but here in the U.S., right?

15        MR. SIMMS: It is United States law, yes, that's

16   right.  And that's why it's so important that the Court allow

17   us sufficient protection under 15:22.  That's the whole, that's

18   the catch under 15:22.

19        Because the Court can say yes, I know that there's a

20   foreign proceeding and I'm, under Chapter 15, supposed to help

21   that foreign proceeding with a qualification that I can't make

22   second class citizens out of U.S. citizens that have U.S.

23   rights.  And as we've seen, that's exactly what will happen

24   here.  We have absolutely no rights in the foreign proceeding

25   as in rem maritime lienholders.

1           THE COURT: You say absolutely, absolutely no in rem

2    first priority lien rights.

3           MR. SIMMS: Exactly, exactly.

4           THE COURT: You have some, you have rights to claim a

5    lien.

6           MR. SIMMS: As, there is none.  I can go in and I can

7    a claim all I want.  And if I could say lien in Korean, I'd get

8    laughed at just probably even more.  The --

9           THE COURT: Well you have to get Korean counsel and

10   assert your position that you're asserting here today.

11          MR. SIMMS: But there is no lien.  There is no lien,

12   there is no lien.  We presented the Korean law right here.  The

13   Hanjin side has had a chance in the last week to come back and

14   to say you're, there's something that infinitesimally

15   approaches a 15:22 sufficient protection for you, it's not

16   there.  They don't have it.

17          And so these ships are going to come in.  Why are

18   they going to come in, because Hanjin can order them to.

19   Because the Court has ordered that the contracts stay in place.

20   The ships must come in.  And we will, as we have, allow them to

21   work and to get all the cargo off.

22          But the, we have the benefitted the ships.  The

23   reason they're here is because of what we've given them, we

24   have maritime liens in rem.  We have to be sufficiently

25   protected.

 1              THE COURT: Yes, but the reason your fuel and tugs

 2     aren't paid for is because of the financial problems of a

 3     company that's based in Korea.  And --

 4              MR. SIMMS: Understood.

 5              THE COURT: And you should go back to South Korea and

 6     assert your rights because of that in that insolvency

 7     proceeding.

 8              I realize that your rights there are probably not

 9     going to be nearly as good as they are here when and if ships

10     come to port.

11              The part of the idea of Chapter 15, one of the

12     principles is internally commodity.  And sometimes people with

13     rights in the U.S. in a Chapter 15 case don't get those exact

14     rights when the U.S. court is the ancillary court and the

15     Korean court is the foreign main court.

16              MR. SIMMS: Well --

17              THE COURT: And I think this is one of those times.

18              MR. SIMMS: Your Honor has given rights to other lien

19     holders, possessory lien holders.  Why is that any different

20     than here?  In other words, you have --

21              THE COURT: Because they had possession when the case

22     filed.  When the case filed in Korea, your vessels were not in

23     U.S. ports.  And as to the vessels in U.S. ports, my ruling

24     didn't apply to them.

25              MR. SIMMS: Possession is perfection.  That is, if

1    they didn't have possession the liens wouldn't be perfected.

2    The maritime liens were automatically perfected when the

3    necessaries were provided to the ships.  So the liens are of no

4    different quality at all.

5              THE COURT: Yes, but they're not any good until the

6    vessel pulls into the U.S. waters.

7              MR. SIMMS: They are, they are --

8              THE COURT: That's the distinction.

9              MR. SIMMS: They are good anywhere that the courts

10   will recognize them.

11             THE COURT: All right, well maybe South Korea is such

12   a court.

13             MR. SIMMS: But it's not Your Honor.  We've presented

14   the law to the Court.  It clearly shows that there are no

15   maritime lien or arrest rights for these creditors in South

16   Korea, zero, none.

17             And Hanjin has already announced where it's going to

18   take the ships, to places where -- that is if they don't go off

19   charter and where they can't be arrested by our clients.

20             And so I don't think that 15:22 allows for the

21   stripping of our client's security in this kind of situation.

22   If Hanjin orders the ships to come in, the ships must come in,

23   if they are still under charter.  They must come in.  The

24   owners don't have a choice unless they're going to breach the

25   charter party and if they're in the Court's jurisdiction,

Simms/Argument                                    20

1    breach the Court's order that keeps the contracts in place.

2              So it's up to Hanjin to say bring the ships in.  And

3    it's up to the owners then to bond them out.

4              But Your Honor you know, back to where we were on

5    Friday, I, and this is why, I started banging away on the

6    motion to reconsider.  There is no sufficient protection that

7    the Court is giving us.  What you're doing is reducing us to

8    being an ordinary creditor.

9              It's as if you took, say there was a mortgage on the

10   ship, a U.S. ship mortgage.  And you said to the ship mortgage

11   holders sorry, I don't want you to arrest the ship in the U.S.

12   It's going to go off and get arrested someplace else where you

13   have no priority.  You will have stripped off an entirely

14   secured creditor recognized under United States law.  Where in

15   the Bankruptcy Code is that ever allowed without giving

16   sufficient, adequate protection.  It's not.

17             And so this is our problem.  And so what we'll have

18   to do is, as we walk out of here, if we're not given sufficient

19   protection and all we're asking is just for these ships and

20   just for these creditors.  Is, we'll have to go upstairs I

21   guess and get a temporary stay and go through the appeal.

22             But there's just, and that's why I wanted to bring

23   the reconsideration motion because there's no way that this can

24   stand.

25             THE COURT: Maybe you'll be right upstairs or

1    downstairs.

2                 MR. SIMMS: All right.

3                 THE COURT: Listen, I've thought -- this has been a

4    tough issue and I fully understand your argument.  I thought

5    about it before Friday.  I knew this was going to be a sticky

6    issue.  I've thought about it since.

7                 I think that one of the principles of Chapter 15 is

8    deference to the main court, the center of main interests and

9    here that's South Korea.

10                If I, I'm not called upon to enforce every U.S. lien

11   holder right to the letter.  And here I was persuaded a lot by

12   the fact that the automatic stay was in place in Korea, the

13   Korean version of the automatic stay.  And the fact that at the

14   time the case was filed in Korea, these vessels were not, the

15   vessels that are stayed and are not getting adequate protection

16   other than the right to pursue their claims in South Korea,

17   they were not in U.S. ports.  And so the liens was inchoate and

18   would not become real and valuable until the vessels pulled

19   into the U.S.  So in essence you were getting a valuable lien

20   post petition and contrary to a stay issued by the foreign main

21   court.

22                MR. SIMMS: Your Honor we're not --

23                THE COURT: I'm not done yet.  Also I was motivated by

24   the practicalities of this case, the fact that the BCOs in

25   particular needed to get their cargo into port.  And the

1    debtor, the debtor ships were at least hesitant to come into

2    U.S. if their vessels were going to be seized.  I was also

3    motivated by the lack of working capital at this point in time.

4              The case was at a standstill.  I thought the issuance

5    of a stay would get commerce moving in the ordinary course.

6              So I thought I was right then and I still do.  I

7    still do.  But it wasn't an easy decision and I fully

8    understand.  But I think this is a Chapter 15 case, it's not a

9    Chapter 11 case.  And in Chapter 15 U.S. law is important.  But

10   when you talk about the debtor/creditor relationships and

11   claims against the debtor and its assets, the law of the

12   foreign main proceeding should be enforced unless that law is

13   manifestly offensive to American interests.

14             That doesn't mean that everything that is not

15   completely the same as U.S. law should not be enforced.  But

16   that was my reasoning.  I still believe it's the right

17   decision.  Is there anything else that you have or Mr. Reed?

18             MR. REED: I would just like to be heard briefly

19   Judge.  Steve Reed of Gregory & Reed on behalf of World Fuel

20   Services, Inc.

21             I'm not going to reiterate everything that Mr. Simms

22   said.  But I just wanted to say Judge I think in the scheme of

23   things, Your Honor's opinion was based on the fact that the

24   vessel could enter freely into the ports and also be able to

25   leave freely.

1          THE COURT: Right.

2          MR. REED: And now we know that, we believe that

3    leaving freely isn't so important anymore because we believe

4    the charters are either going to be revoked, in which case I

5    suppose a stay wouldn't apply.  Or if they were just going to

6    be sitting in the ports, the owners will take them out and take

7    them out of the jurisdiction of the United States and therefore

8    essentially what we've argued, strip our liens.  So they're not

9    --

10         THE COURT: No, your lien won't be stripped.  It will

11   still -- I'm not stripping anything.  I'm just saying that you

12   can't enforce here in the U.S. right now.

13         MR. REED: If those vessels leave the U.S. ports and

14   don't go to another jurisdiction that will recognize our U.S.

15   liens under Rule C, we're not going to have those liens any

16   longer.

17         THE COURT: But you have that risk anyway if you

18   supply a vessel that travels from the U.S., in and out of the

19   U.S. That's a risk that you've had, you know, since you

20   supplied the fuel.

21         Listen, something might change down the road and the

22   vessels might come back to the U.S. like if the charter's

23   revoked, then you can enforce your liens.  I'm not saying you

24   can't.  I'm not saying you can't try to enforce your liens in

25   the Korean proceeding.  I don't know if you're as pessimistic

1    as Mr. Simms about your rights there.  But I don't know what a

2    Korean Court would do.  I don't know what, how they evaluate

3    claims that are very strong under U.S. law.  Maybe they might

4    apply U.S. law in Korea.  I don't know.

5              MR. REED: But --

6              THE COURT: But I just couldn't bring this case to a

7    -- we needed to get these vessels moving.  And it appeared to

8    me that the vessels weren't going to move to the U.S. with

9    cargo owned by BCOs unless they did so under the protective

10   umbrella of the automatic stay.

11             And I wish I could have ordered adequate protection

12   but there was no ability for the debtor to do that and still

13   isn't.  All the debtor, the debtor can barely pay the unloading

14   costs at this point.

15             MR. REED: The debtor has thankfully paid down some of

16   our debt already and the debt that's owed to Mr. Simms.  So I

17   think --

18             THE COURT: Well that's good because you had --

19             MR. REED: Yes.

20             THE COURT: Because the vessel were in U.S. ports when

21   the case was filed.  So those liens transformed from potential

22   liens that would be very valuable when the ship pulled into the

23   U.S., into real liens because the ships were in the U.S.

24             MR. REED: And in the scheme of things, the liens

25   aren't going to be that great anyway as Mr. Simms suggested.

1    He's got only a few vessels that are coming to port.  And my

2    client's telling me now that there are three other vessels that

3    might be coming into port.  And the amounts of money, I can get

4    an accounting on that, but the amount of money is not going to

5    be that great.  So in the scheme of things, you would think

6    that the adequate assurance for payment, whether it's a line of

7    credit, cash, bond, whatever, would not be that significant and

8    the debtor would be able to come up with that money or the ship

9    owner.  Because this is a Rule C in rem action against the ship

10   owner and not against, against, really not against the ship

11   owner, it's really against the ship itself and not against the

12   debtor.  This is assets that aren't owned by the debtor.

13          THE COURT: I understand, I understand.  Ms. Volkov do

14   you have anything to say?

15          MS. VOLKOV: Your Honor I actually had a lot to say

16   but I'm going to take a victory when I can get it.  And so I

17   appreciate the Court's denial of the motion for

18   reconsideration.

19          I actually though perhaps I was in the Twilight Zone

20   because I've always thought that a motion for reconsideration

21   requires the movant to actually set forth what the law is for a

22   motion for reconsideration and that the Court made some, you

23   know, manifest error of law, but.

24          THE COURT: Well listen, you brought this on short

25   notice.  And frankly this issue wasn't flagged for me by you.

1   And also I'm a little concerned by the statement by your Korean

2   counsel during the last hearing to the effect that these liens

3   were strong in the South Korean proceeding.  I don't know

4   whether that is, whether that was just an error.  I do

5   appreciate the fact that someone in Korea sort of modified that

6   statement and watered it down significantly before the end of

7   the hearing.

8          So for that reason I thought and I think the more

9   argument I hear on this the better.  I thought Mr. Simms and

10  Mr. Reed deserved another bite at the apple and

11  reconsideration.  So I didn't think it was unfair.

12         MS. VOLKOV: I'm not saying it's unfair Your Honor.  I

13  just, I'm saying that I'm just sort of hearing the same kind of

14  arguments that I had heard last Friday.

15         The only -- and I don't want my silence as to each

16  and every argument that they made to be construed that I agree

17  with anything.  But if Your Honor would like me to say a couple

18  of things I'm certainly happy to do that as well.

19         But I don't know if Your Honor is sort of done and

20  ruled on the motion for reconsideration.

21         THE COURT: I'm done.  I mean, you can save it for

22  your argument before the District Court if that's where this

23  ends up.

24         MS. VOLKOV: That's fine Your Honor.  Again I just

25  want the record to reflect that I don't agree with many of the

1    things that Mr. Simms has said.  And also with me in Court

2    today is maritime counsel for us that I felt it was important

3    for the Court to hear from our side, to the extent the Court

4    wanted to get into any nitty gritty on the substance of the

5    maritime liens.  But I don't think the Court —-

6              THE COURT: Well I don't think, I think I understand

7    them.

8              MS. VOLKOV: Okay, so.

9              THE COURT: I understand.  I think they're first liens

10   on vessels when they come to the U.S.

11             MS. VOLKOV: Well that's —-

12             THE COURT: Unless the bank is a U.S. approved ship

13   mortgage company.

14             MS. VOLKOV: I think again in theory that's right.  It

15   doesn't mean necessarily that there cannot be holes poked in

16   the actual validity of a lien.  It's not different than, you

17   know, in any bankruptcy case where you challenge the extent of

18   the lien or the actual substantive nature of the lien.

19             In theory, there is the law that says that if you

20   provide necessities, et cetera.  But now that I've learned more

21   about this as well and that's why I brought maritime counsel

22   also, there are many, many arguments that ship owners can make

23   to dispute the validity of a maritime lien.

24             But again Your Honor if we don't need to get into

25   that, we also don't need to get into the fact that not a single

1   piece of evidence on Korean law is actually before the Court

2   through Mr. Simms.  And there's, even if you were to consider

3   anything that Mr. Simms submitted which is not evidential, it

4   actually goes contrary to what Mr. Simms has said.

5          But we are not here to talk about that.  And I'm

6   happy to do that, you know, if Mr. Simms decides to appeal Your

7   Honor's ruling which is what he actually said he was going to

8   do last Friday.  But instead decided to rehash the arguments

9   again.  So thank you Your Honor.

10          THE COURT: All right, I will issue a decision, an

11   order on this motion to -- the motion is going to be denied.

12   And I will set forth my basis in a short decision and order

13   that will be issued by Monday.

14          MR. FEINSTEIN:  Your Honor (inaudible - static)

15          THE COURT: Hold on, I got to turn you down.  All

16   right, say you name again.

17          MR. FEINSTEIN: It's Robert Feinstein, Your Honor.

18          THE COURT: Oh, hello Mr. Feinstein.

19          MR. FEINSTEIN: Your Honor I've been on the whole

20   time.  The Court called me Listen only even though I asked for

21   a live one.

22          So I just want to, number one, thank you for Your

23   Honor's ruling.  Number two with respect to the status

24   conference, everybody vented to the full extent so I don't need

25   to add anything.

Colloquy                          29

1           But if I understood Your Honor correctly, you

2    directed the debtors to negotiate the protocols that would

3    relate to the alliance ships and to goods that are on land

4    which we discussed last Friday and didn't make its way into the

5    protocol.

6           So on behalf of at least HP and I hope other BCOs

7    will join me, I'd like to invite the debtor to a conference

8    call either tomorrow afternoon or Monday morning to try to work

9    out those protocols so that we can report back to Your Honor

10   next Friday that either we've reached agreement or have Your

11   Honor direct the debtors to basically apply the protocol to

12   those two categories of containers, goods and alliance ships

13   and goods at the port.

14          Hopefully we can work out the container problem as

15   well with the container lessors.  But I know Your Honor didn't

16   direct that, but it is gumming up the works.

17          But in any event we can work out the details off

18   line.  But we would like to pursue a discussion with Cole

19   Schotz and with Hanjin about expanding the protocol.

20          THE COURT: All right, well I think it made it pretty

21   clear to Mr. Kiel that I'd like to see that happen.

22          MR. FEINSTEIN: Thank you.

23          THE COURT: All right, we're in recess.  Thank you.

24   Have a good day.

25          MS. VOLKOV: Thank you Your Honor.

1           MR. FEINSTEIN: Thank you Your Honor.

2                       * * * * *

3               C E R T I F I C A T I O N

4       I, TRACY GRIBBEN, court approved transcriber, certify that

5   the foregoing is a correct transcript from the official digital

6   audio recording of the proceedings in the above-entitled

7   matter.

8   */S/TRACY GRIBBEN*

9   TRACY GRIBBEN TRANSCRIPTION, LLC      September 16, 2016

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25